**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LCV CAPITAL MANAGEMENT, LLC,

     **Plaintiff,**

                                       **CIVIL ACTION**

v.

NUOVA ARGO FINANZIARIA S.p.A.,
F/K/A ARGO FINANZIARIA S.p.A.,
DELOITTE & TOUCHE S.p.A, and          **No. 2:18-CV-01645-MRH**
COMPAGNIA ITALIANA ENERGIA IN
LIQUIDATION, S.r.L, F/K/A
COMPAGNIA ITALIANA ENERGIA S.p.A.,

     **Defendants.**

## AMENDED COMPLAINT

Pursuant to the Order of this Court dated January 9, 2020, LCV Capital Management, LLC ("LCV"), by and through its undersigned counsel, files this Amended Complaint against Nuova Argo Finanziaria S.p.A. F/K/A Argo Finanziaria S.p.A. ("Argo"), Deloitte & Touche S.p.A. ("Deloitte"), and Compagnia Italiana Energia in Liquidation S.r.L. F/K/A Compagnia Italiana Energia S.p.A. ("CIE"), alleging as follows:

## INTRODUCTION

Since at least 2016, Defendants have engaged in a pattern of ongoing fraud and misrepresentation targeting Plaintiff and others, with the effect of causing Plaintiff significant financial harm.  Plaintiff's first interaction with Defendants was in 2016, when an associate of the Defendants approached Plaintiff, a company located in Pennsylvania, regarding an "opportunity" to purchase a group of three Italian utility companies (the "Target Companies") then owned and controlled by Defendants Argo and CIE (collectively, the "Gavio Defendants").

The Defendants then worked in concert to intentionally provide Plaintiff with falsified financial information and assurances regarding the Target Companies, inducing Plaintiff to fund the purchase transaction to the tune of approximately €18 million in November 2016.  After the purchase, when Plaintiff obtained access to the Target Companies' real financial information, Plaintiff began to uncover the truth that the companies were effectively insolvent.

Through mid-2017, Plaintiff continued to pour money into the Target Companies in an effort to salvage them.  Throughout this time, Defendants contributed to Plaintiff's growing losses by refusing to provide truthful historical financial records for the Target Companies, making it impossible to issue an accurate 2016 financial statement and maintain necessary credit lines.  Plaintiff was eventually forced to direct the sale of two of the three Target Companies for €1, realizing a loss of approximately $15 million.

The Defendants' fraudulent activity, however, did not stop there.  In or around March 2018, LCV was first informed through Italian counsel that the Gavio Defendants were purportedly willing to settle the above-described dispute for a specific sum to which LCV agreed so long as the deal could be accomplished within a month.  The Gavio Defendants, however, worked to prevent the completion of the settlement over a period of many months, causing hundreds of thousands of dollars to drain away from the value of the proposed settlement amount due to changes in the Euro/Dollar exchange rate during that period, as well as causing LCV to incur significant costs and expenses as it worked in good faith to complete the settlement.  Faced with the Gavio Defendants' dilatory tactics, as well as the obvious fraud perpetrated upon it described above, LCV believed that it was without choice except to commence litigation.

In response to the filing of LCV's litigation in Pennsylvania state court in October 2018 (subsequently removed to this Court), US counsel for the Gavio Defendants contacted LCV's

counsel, seeking a voluntary dismissal of the litigation in order to renew settlement discussions. Plaintiff agreed instead to stay the litigation, and in December 2018, the Gavio Defendants proffered a written settlement offer very similar to the one previously negotiated between Italian counsel, revised to add Deloitte as a settling party.  Following further e-mail and telephone negotiations, the Gavio Defendants solicited LCV and its counsel to attend a settlement meeting in New York City on January 24, 2019.  At that meeting, a preliminary agreement entitled the "Main Terms and Conditions" was negotiated and memorialized in writing, containing most material terms including an agreed settlement amount.  At the meeting, counsel for the Gavio Defendants represented to LCV that Deloitte had previously agreed to the proportion of that set amount Deloitte would pay.  By e-mails dated February 5, 2019, which included all counsel of record for all parties as well as LCV principal Mr. Bonidy, the open items remaining in the "Main Terms and Conditions" were resolved, and final agreement was reached.  All that remained was for the agreed terms and conditions to be incorporated into a longer, formal agreement with boilerplate language and format within two weeks.

That same day, at the request of all Defendants and with the consent of LCV, Gavio's counsel filed a consent motion for extension of time for all Defendants to respond to the Complaint, representing to the Court that the "Parties have reached a settlement of the matter in principle and need additional time to finalize their agreement" and the "four-week extension will promote judicial economy while the parties finalize resolution of the matter."  Over the following weeks, the Defendants introduced new and insupportably broad release and indemnification language into the formal agreement document, and again represented to the court that the parties needed another extension to finalize their agreement, while it became increasingly clear to Plaintiff that Defendants never intended to finalize and perform the agreed

3

settlement in good faith.  In March 2019, Plaintiff filed its Motion to Enforce the settlement in this Court.

While that Motion was pending, Plaintiffs became aware of multiple material facts which were known to Defendants but which Defendants concealed and misrepresented to Plaintiffs, which demonstrated that Defendants had never intended to fulfill their agreed settlement obligations in good faith, and further provided explanation for the Defendants' motives in seeking to insert new release and indemnification language into the formal agreement which did not reflect the agreed Main Terms and Conditions.  These facts included, in part, that Defendant CIE had been placed in liquidation in 2018 and would not be able to make the portion of the settlement payment allocated to it in the Main Terms and Conditions.  These facts also included, in part, that the Gavio Defendants were subject to massive liabilities known to the Defendants and concealed from Plaintiffs, for unpaid Italian taxes and improper charges to utilities customers during the time when the Gavio Defendants owned the Target Companies.  The new release and indemnification language was apparently intended to shift responsibility for these concealed liabilities from the Gavio Defendants to LCV.  Through their pattern of ongoing fraud, bad faith, and misrepresentation throughout the post transaction period, Defendants have caused Plaintiff significant additional damages in the form of unpaid settlement funds, costs and expenses, and opportunity costs.

In light of the foregoing, Plaintiff files this Amended Complaint

### VENUE AND JURISDICTION

1.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) as there is diversity of citizenship and the amount in controversy exceeds $75,000.  Supplemental

jurisdiction over the state law claims also exists pursuant to 18 U.S.C. § 1367.

2.      Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, insofar as a substantial part of the events, omissions, and property that are the subject of the action are situated in this district, and the defendants are subject to the Court's personal jurisdiction with respect to this action.

**PARTIES**

3.      Plaintiff, LCV Capital Management, LLC ("LCV") is a limited liability company with its principal place of business at 1000 McKnight Park Drive Suite 1006B, Pittsburgh, PA 15237, and incorporated in Delaware.  LCV is a private investment management company owned primarily by Mr. Lodovico de Visconti and Mr. Anthony Bonidy, both United States citizens.  At times relevant to this Complaint, both Mr. de Visconti and Mr. Bonidy worked and/or resided in Allegheny County, Pennsylvania.

4.      Upon information and belief, Defendant Nuova Argo Finanziaria, S.p.A., formerly known as Argo Finanziaria, S.p.A., is a "Società per azioni", or an Italian "company with shares".  Upon information and belief, a portion of Argo Finanziaria's assets were spun off to create Nuova Argo Finanziaria after Defendants became aware of LCV's claims against them, but the entities share substantially the same management, address, and activities.  Defendant Argo is part of the large Italian group of companies with global business in, *inter alia*, the energy sector, engineering, technology, and toll road management, commonly referred to as "Gruppo Gavio" or "Gavio Group".  Upon further information and belief, Defendant Argo is the parent company of Defendant CIE, and has a principal place of business at Corso Romita 10 Cap 15057, Tortona (AL), Italy.

5.      Upon information and belief, Defendant Deloitte & Touche S.p.A. is a "Società

per azioni", or an Italian "company with shares", with principal places of business at Galleria

San Federico 54, 10121 Tornio TO, Italy and Via Tortona 25, 20144 Milano MI, Italy.

Defendant Deloitte was hired by the Gavio Defendants to provide purportedly independent,

third-party audited financial statements for the Target Companies.

6.      Upon information and belief, Defendant Compagnia Italiana Energia S.p.A. was a

"Società per azioni", or an Italian "company with shares", with principal places of business at

Via Bonzanigo 22, 10144 Torino, Italy.  Upon information and belief, at times relevant herein,

approximately 94% of the shares of CIE were owned by Defendant Argo.  Upon further

information and belief, CIE was placed in liquidation in approximately June 2018, causing it to

change its governance structure and change its name to Compagnia Italiana Energia in

Liquidation S.r.L.

## FACTUAL BACKGROUND

### A.      Defendants and Their Associates Solicit Business With LCV

7.      Upon information and belief, Defendants Argo, CIE, and Deloitte have a

longstanding business relationship, which relationship predated the events in this Complaint and

continues through the present, through which Deloitte provides auditing, accounting, and related

services to Argo, CIE, and other businesses in the Gavio Group.

8.      In 2016, upon information and belief, the Gavio Defendants were seeking to sell a

group of three Italian utility companies owned 100% by CIE—specifically, Energrid S.p.A.

("Energrid"), Energia e Territorio S.p.A. ("EET"), and Servizi Italiana Gas S.r.l ("SIG")

(collectively, the "Target Companies").

9.      Upon information and belief, in furtherance of this effort, a former Deloitte

partner, Mr. Franco Riccomagno, introduced Mr. Luca Calvetti to Mr. Stefano Viviano, who at

that time held the positions of Chief Financial Officer of Argo, as well as being a board member of both CIE and Energrid.  Mr. Calvetti had previously worked with Mr. Riccomagno, and had prior experience working as an executive in the Italian utilities sector.  Upon information and belief, Mr. Calvetti entered into an agreement with Argo and Mr. Viviano to assist them in recruiting potential buyers for the Target Companies, in consideration of which Mr. Calvetti may also have received compensation from the Gavio Defendants.

10.     In this capacity, Mr. Calvetti first initiated contact with LCV in mid 2016 through Studio Cisnetto, an Italian business consulting company working for LCV.  Mr. Calvetti represented himself to LCV as an independent investment advisor with specialized knowledge of the Italian utilities sector.  Mr. Calvetti then informed LCV of the "opportunity" to purchase the Target Companies, and proposed that he could act as LCV's agent in evaluating that investment "opportunity" and in negotiating the deal.

11.     Based upon these representations, LCV agreed to have Mr. Calvetti act as its agent in evaluating and negotiating a potential acquisition of the Target Companies.  As part of this arrangement, Mr. Calvetti agreed to waive his finder's fee to LCV of approximately €80,000-€100,000 if LCV would agree to appoint him as CEO of Energrid if and when the acquisition was completed.  LCV agreed to this arrangement, in significant part because LCV was a US investment corporation without experience in operating Italian utilities companies, while Mr. Calvetti had previously worked as Chief Operating Officer of an Italian utility company similar in nature to Energrid.

12.     In reality, Mr. Calvetti never acted in good faith in LCV's interests, but instead surreptitiously worked to further his own pecuniary interests and those of Mr. Viviano and the Gavio Defendants, in accordance with his prior undisclosed agreement and/or arrangement with

those entities.

**B.      Pre-Transaction Events**

13.      During the negotiation period, between July and November 2016, Mr. Viviano

and the Defendants engaged in a pattern of sending blatantly false, fabricated, and fraudulent

financial information to LCV in order to induce LCV to invest in the Target Companies.

14.      These fraudulent communications were typically, but not always, provided from

Mr. Viviano and Defendants to Mr. de Visconti as Managing Member of LCV through Mr.

Calvetti, in Mr. Calvetti's dual capacity as the Defendants' conspirator and LCV's purported

agent.  At the time of these communications, Mr. de Visconti's e-mail address to which the

messages were directed identified his position with "lcvcapitalmgmt.com", and Mr. de Visconti's

primary residence and workplace for LCV were both in Allegheny County, Pennsylvania.

Fraudulent communications were also sent to LCV member Mr. Tim Youssef, who was located

in New York at the time of the communications.

15.      Upon information and belief, Mr. Calvetti knew and understood that he was

providing LCV with false and fraudulent communications from Mr. Viviano and the Defendants,

but concealed this information from LCV in order to further his own pecuniary interests and

those of his co-conspirators, including Mr. Viviano and the Defendants.

16.      As part of the due diligence process associated with the transaction, LCV

requested that the Gavio Defendants provide certified audited financial statements for the Target

Companies for the 6-month period ended June 2016.

17.      Those financial statements, including the balance sheet assets and liabilities, were

audited, certified, and presented to LCV by the Gavio Defendants' directors and officers,

including Mr. Viviano, together with their long-term auditors, Deloitte.  Upon information and belief, those financial statements had also been reviewed and approved by the officers, board members, and Statutory Auditors of each of the Target Companies.

18.     Deloitte prepared the audit and certified the financial statements, including the balance sheet assets and liabilities, and these certified documents were provided to LCV and became the determining factor for LCV's decision invest in the Target Companies and complete the purchase transaction on terms very favorable to Argo and CIE.

19.     The false and fraudulent communications upon which LCV relied included, but were not limited to, the following (attached hereto as a composite **Exhibit A** by way of identification and example, and excluding the e-mails' respective voluminous attachments, which are already in Defendants' possession inasmuch as they were parties to the communications and, in many cases, the author(s) of the attachments):

> a.   E-mail dated 7/30/16 from Mr. Calvetti to Mr. de Visconti and Mr. Youssef of LCV, describing a meeting between Mr. Calvetti and Mr. Viviano in which they purportedly "had the chance to build a good and frank relationship" and discuss "details".  This e-mail further contains, *inter alia*, falsified Balance Sheet information for the Target Companies, prepared by Defendant Deloitte, attaches a draft non-binding term sheet prepared by Mr. Calvetti, and solicits a telephone call with LCV members in the US.  The draft term sheet refers to LCV as the buyer, through a "Newco" to be established by LCV in Luxembourg.

> b.   E-mail dated 8/1/16 from Mr. Calvetti to Mr. de Visconti and Mr. Youssef, conveying additional information given to Mr. Calvetti by Mr. Viviano in order to urge and facilitate acquisition of the Target Companies by LCV on terms favorable to Mr. Viviano, Argo, and CIE.

> c.   E-mail dated 8/1/16 from Mr. de Visconti to Mr. Calvetti and Mr. Youssef, attaching a version of the draft term sheet edited to reflect Mr. Viviano's

comments provided through Mr. Calvetti in a telephone call with Mr. de Visconti and Mr. Bonidy (in Pittsburgh) and Mr. Youssef (in New York) earlier that day.

d.  Multiple e-mails dated 8/2/16 from Mr. Calvetti to Mr. de Visconti, attaching drafts of the term sheet with "mark-up" comments from Mr. Viviano and the Gavio Defendants, soliciting a phone call to discuss the same with Mr. de Visconti, describing conversations with Mr. Viviano and other executives within the Gavio Group regarding LCV's possible acquisition of the Target Companies, outlining a strategy Mr. Calvetti had reportedly discussed with Mr. Viviano and others to promote LCV's offer over another purportedly competing offer, Mr. Viviano's and the Gavio Defendants' desire to complete the "DD" [i.e. due diligence] quickly, and suggesting that "Deloitte perform the DD, [because] this would be easier as they are the auditor and most activities could be declared as Upon Agreed Procedures asked by the Group."

e.  E-mail dated 8/25/16 from Mr. Calvetti to Mr. de Visconti and Mr. Youssef of LCV, LCV advisor Gianluca Calvosa from Studio Cisnetto, and Ms. Antonella Alfonsi of Deloitte Legal acting as lawyer for LCV, containing a progress summary of due diligence based on information provided by Mr. Viviano and other Gavio Defendants' executives in response to direct due diligence questions from LCV.  Also attached to this e-mail was detailed information about the Target Companies' business plan, financial reporting containing falsified numbers including multiple references to the sufficiency of the Target Companies' working capital, which LCV later discovered to be based upon the presence of fake receivables in the financials, meaning that Energrid actually had a negative working capital at the time and was operating at a loss.  Additionally, the attachments touted an "extraordinary profit" for Energrid.  Upon information and belief, this same "extraordinary profit" was later found by the Italian government to be improper, causing it to launch a criminal tax fraud investigation against certain individual officers, directors, and statutory auditors of CIE, Argo, and others within the Gavio Group.  Upon information and belief, the attached financials were based upon information provided by Deloitte, Mr. Viviano, Argo, and CIE, among others.

f.  E-mail dated 8/29/16 from Mr. Calvetti to Mr. de Visconti and Mr. Youssef of LCV, LCV advisor Mr. Calvosa, and Ms. Alfonsi containing further update on due diligence and containing attachments of fifteen files downloaded directly from the Gavio Defendants' data room, provided by Mr. Viviano in response to LCV's due diligence questions.  Each of these attachments contained information relied upon by LCV.  By way of example, an attached Excel file entitled "FI-18 Fondo Svalutazione Crediti June 2016 Recap.xls" specifically indicates that only €3 million had been allowed for bad accounts receivable, and describes the Target Companies' purported write-off procedures.  Upon information and belief, the attached financials and other representations were based upon information provided by Deloitte, Mr. Viviano, Argo, and CIE, among others.  LCV later discovered that those procedures were not followed, that Defendants had maintained an internal write-off file that contradicted the attached information and was not disclosed to LCV, and which revealed that Energrid's working capital was negative and that Energrid was effectively insolvent at the time of the negotiations with LCV.

g.  E-mail dated 9/24/16 from Mr. Calvetti to Mr. de Visconti, Mr. Calvosa, and to Ms. Alfonsi, conveying Mr. Viviano's/Argo's comments to the post-due diligence draft Binding Offer from LCV including, in particular, the deletion of legal recourse against the Directors and Statutory Auditors for "gross mismanagement" of the Target Companies, and seeking to introduce a clause by which, if LCV were to sell the Target Companies within five years, any new owner would also be subject to that limitation.

h.  E-mail dated 9/25/16 from Mr. Calvetti to Mr. de Visconti in response to comments and questions in a revised version of the Binding Offer sent by Ms. Alfonsi earlier that day, and explicitly conveying due diligence financial information provided by Mr. Viviano and the Gavio Defendants.  In the attached version of the Binding Offer, LCV declined to strike the language allowing litigation against the Target Companies' Directors and Statutory Auditors for gross mismanagement.

i. E-mail dated 9/28/16 from Mr. Calvetti to Mr. de Visconti, Mr. Calvosa, and Ms. Alfonsi, providing false details of intercompany debts and credits between the Target Companies, CIE, Argo, and other Gavio Group companies, in response to due diligence questions from LCV. As generally indicated in this e-mail, these intercompany debts affect the Target Companies' taxes. As LCV later discovered, the maze of intercompany dealing was intentionally opaque, and was designed to understate taxes, which, upon information and belief, turned out to be a significant factor in the Italian tax authority's subsequent decision to initiate a criminal investigation and levy charges and penalties against certain officers, directors, and statutory auditors of the Gavio Defendants.

j. E-mail dated 9/30/16 from Mr. de Visconti to the CEO of Argo, Mr. Alberto Rubegni, referencing a telephone call Mr. de Visconti had received from Mr. Rubegni the day before to "resolve the main points [in the Binding Offer], as principal to principal, in a prudent manner." Mr. de Visconti attached an executed copy of the final Binding Offer in his message to Mr. Rubegni, reflecting the points "exactly as [they] discussed last night." The Binding Offer clearly states that it is provided by LCV Capital Management, LLC in Pittsburgh as the Investor, to Argo Finanziaria S.p.A. The Binding Offer and attached Term Sheet also indicates that HII S.a.r.l. ("HII"), a private company organized under the laws of Luxembourg, would serve as the Purchaser in the transaction. HII is the "Newco" referred to in the draft term sheet attached to the e-mail identified above, dated 7/30/16.

k. Multiple e-mails dated 10/24/16 from Mr. Calvetti to Mr. de Visconti and Mr. Calvosa, providing purported updated and forecasted financial information for the Target Companies, which LCV had requested in connection with obtaining additional credit line financing from US partners. Upon information and belief, at this point in time, the Gavio Defendants had appointed Mr. Calvetti to Energrid's Board of directors "to keep track on the management of the company in the interim period."

20. On November 9, 2016, HII S.a r.l. and Compagnia Italiana Energia S.p.A. entered

into a Shares Purchase Agreement (the "SPA"), pursuant to which CIE sold the three Target Companies to HII.  The SPA identifies that the corporate capital of HII was owned 76% by Mr. de Visconti, 15% by Mr. Bonidy, and 9% by Gladius Investors II, LP ("Gladius").  Gladius is a Delaware corporation with its principal place of business in Pennsylvania.  The SPA indicates that any notices or service to CIE required under the SPA may be directed to Mr. Viviano via his e-mail address with Defendant Argo.  The SPA was executed by Mr. de Visconti on behalf of HII, and Mr. Gianni Luciani as CEO of CIE.

21.     In addition to the documents and communications set forth in Paragraph 19 above, LCV relied upon the information provided in e-mails and through electronic file transfer as set forth and specifically identified in Schedule H to the SPA, attached hereto as **Exhibit B**.

22.     Contemporaneous with the execution of the SPA, LCV executed a letter to the board of directors of CIE indicating, *inter alia*, that HII was a holding company under LCV's control, and that LCV guaranteed to CIE the payment by HII of the purchase price, up to a maximum guaranteed amount equal to €2.65 million.  The letter clearly indicated LCV's place of business as Pittsburgh, Pennsylvania.

23.     By letter dated November 18, 2016, in accordance with the provisions of the SPA, HII designated Energrid Holding Inc. ("EH") to act as purchaser of the Target Companies in place of HII.  EH is a Delaware holding company wholly owned by HII and incorporated for the purpose of holding the Target Companies.

24.     The transaction closed at the end of November 2016, and the total price paid was approximately €18 million, comprised of €10.5 million cash paid to Argo by LCV through EH, approximately €6 million in repayment of a shareholder loan by Energrid to Argo at closing, and €1.5 million for various transaction expenses.  The purchase price was financed through EH

equity and debt from Key Bank in the U.S. and through existing Energrid funds (for the shareholder debt repayment).

25.     At the times of the occurrences set forth above, Plaintiff was located within Allegheny County, Pennsylvania, and Defendants' actions and communications were knowingly and intentionally directed at Plaintiff LCV and its agents and representatives located within this jurisdiction.

### C.     **Post-Transaction Events**

26.     In the period between March and May 2017, after the purchase through EH was completed and LCV had obtained control of the Target Companies, LCV and its affiliates began work in preparation for the 2016 annual audit of the Target Companies.  It was at this time that LCV discovered material representations and fraudulent activity related to the certified financial statements Deloitte had issued.  Among many, the following major items were identified:

     a.  First, uncollectable (and dated) trade accounts receivable ("A/R") in Energrid in the amount of approximately €18 million dating for up to five years prior to the transaction had been certified as current and collectable by Deloitte and represented as such by Argo, CIE, and the individuals representing them, despite the existence of internal written correspondence stating that these A/R should have been written off long before.

     b.  Neither Argo, CIE, Deloitte, nor any of the individuals representing them, ever disclosed or otherwise warned about the impaired nature of this A/R in any of their audits of Energrid for the previous five years, including the June 2016 audit.

     c.  This A/R represented almost 200% of Energrid's net working capital and was approximately two to three times the size of Energrid's net equity, and essentially meant that Energrid was insolvent at the time of the transaction.

d.  Second, Deloitte certified goodwill value of approximately €27 million related to a supply contract from an energy distributor in the form of a rebate scaling commission that was based on certain favorable pricing conditions better than market terms for Energrid, but which, unbeknownst to Plaintiff, had already expired three years prior to the transaction.  When LCV later confronted Deloitte regarding this improper goodwill certification, Deloitte acknowledged that it was aware of the facts of the supply contract but nevertheless knowingly chose to certify the goodwill, contrary to accounting principles.

e.  In addition, as Plaintiff has learned subsequently, that "goodwill" representation was further based on clients and volume scale projections that were missed cumulatively by as much as 1000% by the time of Closing.

f.  However, neither Deloitte, Argo, CIE, nor any of the individuals representing them ever impaired or wrote down this "goodwill", but instead by way of fraud by omission, represented it as still being valid for the improper purpose of artificially inflating the net equity of Energrid.

g.  The ultimate write-off of this phantom goodwill—done only after LCV and EH had completed the purchase and discovered the fraud perpetrated against it—not only wiped out any equity in Energrid, but also took the company's book value into deep negative territory, resulting in Energrid becoming unable to continue business on an ordinary basis, and rendering it substantially insolvent.

h.  Third, these same accounting "practices" also served as the basis for the Gavio Defendants claiming a historically robust business for Energrid in order to maintain an investment grade credit rating—a rating essential for Energrid to function in its day-to-day operations, and the absence of which would have caused

15

the business to collapse even before Closing.  It is not without significance, then, that despite its actual book value before Closing, the Company was falsely purported to have positive equity at the time of negotiation and Closing.

i.  Deloitte was quite aware of this and enabled Energrid's false credit rating to be touted as proof of Energrid's stability prior to the transaction.

j.  Upon information and belief, Deloitte also actively sought out and supported the Gavio Defendants in the transaction for the sole purpose of inducing LCV to proceed with the Closing by, for example, preparing and disseminating an atypical mid-year "audit" of the financials of Energrid and EET for the specific purpose of aiding the Gavio Defendants in selling the Target Companies by fabricating false assurances for potential investors that the Target Companies were in strong financial condition.

27.  Upon discovering the foregoing, LCV promptly confronted Mr. Calvetti regarding his role in working together with the Defendants and Mr. Viviano to induce LCV to acquire the Target Companies.  Mr. Calvetti did not deny knowing that the financials and other information he conveyed from Defendants and Mr. Viviano to LCV for LCV's reliance in entering the deal had been false and fraudulent, but instead simply replied that he was not the one who falsified the financial documents.  LCV took immediate action to remove Mr. Calvetti as CEO of Energrid, although during Mr. Calvetti's brief tenure with Energrid he received approximately €250,000 in compensation and benefits.

28.  LCV also raised the foregoing issues with the Defendants as well as their individual directors and officers beginning in 2017, but their response was to deny knowledge of the foregoing and to blame previous and current management of Energrid for the tissue of lies perpetrated upon LCV.

29.     By way of example, by e-mail dated 8/1/17 from Mr. de Visconti to Mr. Rubegni and Mr. Viviano, LCV stated that it sought a commercial resolution of the situation after LCV had discovered documentary evidence of "material misleading information" and an "incorrect auditing process" on which LCV relied both during the due diligence process as well as at the time of the letter as it worked through the morass created by Defendants and their agents and associates and endeavored to put together reliable 2016 financial statements and keep Energrid afloat.  LCV further noted that "We have taken, and continue to take, extraordinary steps to fix this situation and balance sheet contributions at Energrid and, as a result, have sustained significant monetary losses at the U.S. holding company-level that are unacceptable and that would potentially further increase."

30.     Mr. Rubegni replied to Mr. de Visconti by way of e-mail dated 8/2/17, copying Mr. Viviano, falsely representing on behalf of Argo and CIE that the negotiations and agreement "were conducted and entered into by our Company in full correctness, good faith and transparency" and stating that they were refusing to "be involved in problems which may not entail any responsibility of our Company."

31.     Ultimately, in order to protect the interests of LCV and EH, EH had no choice but to refuse to approve the 2016 Energrid financial statement as it was clearly prepared using false information.  Deloitte was requested to provide an explanation for the false information found in the 2016 financial statement but it has refused to do so, and instead has blamed Argo and CIE for the discrepancies between the audited financials and reality.

32.     During this time frame, LCV became aware that on July 25, 2017, a letter was sent on Energrid letterhead to EH's creditor, Key Bank Commercial Banking in Pittsburgh, Pennsylvania, requesting that EH's detailed financial information be sent directly to Deloitte, and authorizing that Key Bank "disregard [its] obligations towards us imposed by any regulation or

practice which would otherwise be binding on [it] in connection with bankers secrecy…," purportedly in connection with an audit by Deloitte of Energrid.  This letter was purportedly, although not actually, sent by Mr. de Visconti, and Mr. de Visconti's signature had been forged at the bottom of the letter.  Mr. de Visconti was alerted to this fraudulent letter on July 28, 2017.

33.     In an effort to save Energrid, between July and September 2017, LCV, through EH, continued to pour money into Energrid to make up for the net working capital shortfall caused by the non-existent A/R.  Despite that effort, given Deloitte's acrimonious refusal to explain its conduct which rendered it impossible to issue an accurate financial statement, EH lost its own credit rating, and its banks froze its credit lines.

34.     As a result, EH was forced to sell Energrid's and EET's business concerns for €1 in November 2017 and April 2018 respectively to a third-party energy company in Italy, Green Network, S.p.A. ("Green Network").  Those two Target Companies had to be sold together because they are inextricably linked, sharing staff, billing, systems, and clients, and in effect could not survive separately.

35.     Energrid and EET were placed in liquidation immediately following the sale to Green Network, with LCV retaining responsibility for managing the companies' affairs in liquidation.

36.     At this point, EH had realized a loss of more than US $15 million, which loss was suffered and absorbed directly by Plaintiff LCV.  Because the shares of Energrid were held by EH, and LCV provided substantially 100% of the financing (both equity and shareholder loans) to EH for the purchase and operation of Energrid, when Energrid went under and had to be sold, all of the unpaid balances back to Energrid Holdings were absorbed directly by LCV.

D.    **Preliminary Agreement Events**

37.    The Defendants' fraudulent activity, however, did not stop there.  In or around March 2018, LCV was first informed through Italian counsel that the Gavio Defendants were purportedly willing to settle the above-described dispute for a specific sum to which LCV agreed so long as the deal could be accomplished within a month.

38.    The Gavio Defendants, however, worked to prevent the completion of the settlement over a period of many months, causing hundreds of thousands of dollars to drain away from the value of the proposed settlement amount due to changes in the Euro/Dollar exchange rate during that period, as well as causing LCV to incur significant costs and expenses as it worked in good faith to complete the settlement.  Faced with the Gavio Defendants' dilatory tactics, as well as the obvious fraud perpetrated upon it described above, LCV believed that it was without choice except to commence litigation.

39.    On or about October 23, 2018, the Plaintiff filed suit against Defendants in the Court of Common Pleas of Allegheny County, Pennsylvania, Civil Action Number GD-18-013774, alleging counts of fraud and civil conspiracy.

40.    Following the filing of the Complaint, attorney Daniel Mach of Quinn Emanuel in New York, who had been retained as counsel for the Gavio Defendants, contacted LCV's counsel and requested that LCV voluntarily dismiss its Pennsylvania complaint without prejudice to give the parties an opportunity to discuss resolution of the dispute without the time constraints created by the federal removal statute.  Attached hereto as part of composite **Exhibit C**.  By e-mail dated December 7, 2018, LCV's counsel responded to that request by stating that LCV was not willing to dismiss its complaint at that time, but that it would be willing to work with Gavio to address timing concerns, and setting forth settlement terms under which LCV would be willing to dismiss

its complaint with prejudice. *Id*.

41.     On December 10, 2018, Italian counsel for the Gavio Defendants e-mailed to LCV's counsel a set of proposed Main Terms and Conditions that had been drafted following earlier discussions between Italian counsel for the parties. Exhibit C.

42.     On or about December 12, 2018, the Defendants removed the Pennsylvania state action to this Court based on diversity of citizenship of the parties.

43.     On December 13, 2018, LCV's counsel returned a redline edited version of the Main Terms and Conditions to Mr. Mach, and agreed to a 60 day extension of Defendants' time to respond to the Complaint, with the stated expectation that the settlement should be executed and performed within that time period. Exhibit C.

44.     The Gavio Defendants' New York counsel responded that they would prepare the consent motion and proposed order, and did so later that day, by way of e-mail addressed not only to LCV's counsel, but also to Deloitte's New York counsel and the Gavio Defendants' own counsel in Pittsburgh, Marcus Shapira.  Exhibit C.

45.     On December 15, 2018, Defendant Argo by its Pennsylvania counsel filed the consent motion for extension, representing to the Court that the "Parties are discussing settlement of the matter and need additional time to do so," and that the "extension will promote judicial economy while the parties discuss resolution of the matter."  On December 17, 2018, the Court granted that motion and designated this case for placement into the Alternative Dispute Resolution ("ADR") program.

46.     On December 27, 2018, having received indications that the Gavio Defendants did

not intend to abide by the Court's ADR referral, LCV's counsel sent a letter to all counsel of

record for the Gavio Defendants and Deloitte in the instant matter.  This letter noted that if the

parties did not intend to engage in good faith negotiations, LCV would be obliged to inform the

Court that the basis for the stay had been improperly obtained, and again attached a redlined

version of the proposed Main Terms and Conditions to which LCV would be willing to agree.

47.     Mr. Mach, who had not yet entered his appearance in the instant action, wrote to

LCV's counsel later that day, asking that he and Mr. Calamari (also of Quinn Emanuel) be

included on future correspondence relating to the dispute. Exhibit C.

48.     By letter dated January 7, 2019, addressed to LCV's counsel and copied to all New

York and Pennsylvania counsel for both the Gavio Defendants and Deloitte, Mr. Calamari

responded on behalf of the Gavio Defendants that they would "continue to seek good-faith

negotiations," and attached another draft version of the Main Terms and Conditions, also dated

January 7, to which Gavio would be willing to agree. Exhibit C.

49.     Following this exchange of draft settlement terms, Mr. Mach reached out to Mr.

Stanley by telephone and e-mail on January 11, 2019, inviting LCV to attend a face to face

meeting at Quinn Emanuel's New York office to try to reach an agreement on settlement terms.

Exhibit C.

50.     Based upon this solicitation of a meeting, Mr. Stanley and Mr. Bonidy on behalf of

LCV made travel arrangements, and flew from Pittsburgh to New York on January 24, 2019.  In

attendance at this meeting were Mr. Mach, Mr. Calamari, and Italian counsel Mr. Carlo Croff on

behalf of the Gavio Defendants, and Mr. Bonidy and Mr. Stanley on behalf of LCV.

51.     Both prior to and during the meeting, LCV asked whether Deloitte would be

represented at the meeting.  Exhibit C.  In response, Mr. Croff represented directly to Mr. Bonidy that the Gavio Defendants and Deloitte had reached an agreement on the percentage split of the settlement payment between themselves and that the meeting could proceed with Deloitte's interests accounted for on that basis. Deloitte has subsequently contradicted this assertion in its court filings.

52.     The meeting lasted approximately two hours, during which the group in attendance went through the Gavio Defendants' January 7 draft of the Main Terms and Conditions in detail, and agreed upon revisions to that document which were added to the document by Mr. Mach, and distributed to the meeting attendees to review for accuracy.  By the end of that meeting, there were only two outstanding terms to be decided—the settlement amount, and an issue in the terms and conditions referencing Italian law that counsel for LCV wanted to discuss with counsel versed in Italian law before agreeing.

53.     Following that meeting, Mr. Mach reached out to LCV's counsel on January 29, 2019, attaching a clean copy of the Main Terms and Conditions agreed upon during the New York meeting, and asking whether LCV had further information regarding the open issues, stating "Can you please advise us as to whether you are prepared to proceed on the terms set forth no later than Thursday January 31, 2019, as we will need to devote our efforts to responding to the complaint after that?" Exhibit C.

54.     In a series of e-mail communications between January 29 and February 5, 2019, the parties communicated and negotiated regarding the remaining open terms.  Counsel for Deloitte was included and fully apprised of all ongoing negotiations. Exhibit C.

55.     By e-mails dated February 5, 2019, which included all counsel of record for all

parties as well as LCV principal Mr. Bonidy, the remaining open items between the parties were resolved, and final agreement on the Main Terms and Conditions was reached.  Exhibit C.

56.     The Main Terms and Conditions reflect an agreement reached between LCV, the Target Companies, HII, and EH on one side, and Defendants CIE, Argo, and Deloitte.  These parties agreed to mutual general releases and cross releases releasing any claim the parties may have against each other, "including but not limited to any claim arising out of, or in any way relating to, the transactions occurrences and claims which are the subject of the Pennsylvania action…."  See Main Terms and Conditions as modified to reflect February 5 agreements, attached hereto as **Exhibit D**.  The consideration for these releases by LCV was the completion of a condition precedent and the payment of a sum certain, after which LCV would dismiss the present litigation with prejudice.

57.     There were only two conditions precedent to the performance of the agreement set forth in the Main Terms and Conditions.

58.     The first condition precedent was for Energrid to draw up "a financial plan for the repayment of its indebtedness to be verified by an independent expert pursuant to Article 67 of the Italian Bankruptcy Act."  The independent expert was to have 30 days from the date of the execution of the settlement agreement to complete the Article 67 process.

59.     In short, the Article 67 process involves an external audit of the bankrupt company's liquidation value, and an assessment of whether the assets are sufficient to pay the outstanding liabilities.  The independent audit cannot be certified while liabilities exceed assets. Once the audit is certified, the company can move forward with an orderly dissolution.

60.     The Main Terms and Conditions contained an agreement for the Defendants to

make two separate payments.  One payment of a specified amount was to be made by CIE to EH in settlement of the claims against the Defendants.  The other payment of a specified sum was to be made by CIE, Argo, and Deloitte severally directly to Energrid, which amount was believed by LCV and represented by the Defendants to be sufficient to pay Energrid's known liabilities at that time, such that the Article 67 audit could be certified and Energrid could ultimately be dissolved.

61.     The second condition precedent in the Main Terms and Conditions was the adoption of shareholders' resolutions by the Target Companies approving the settlement, which could have been quickly and easily accomplished upon completion of the first condition precedent.

62.     The same day that final agreement was reached on the Main Terms and Conditions, Mr. Mach prepared and the Gavio Defendants' Pennsylvania counsel, Mr. Engle of Marcus Shapira, filed a consent motion for extension of time for all Defendants to respond to the Complaint on the basis that the "Parties have reached a settlement of the matter in principle and need additional time to finalize their agreement" and the "four-week extension will promote judicial economy while the parties finalize resolution of the matter."  By request of Mr. Dell, counsel for Deloitte, the requested extension was for four weeks rather than two, to give the parties sufficient time to formalize the preliminary agreement reached between them. Exhibit C.

63.     On February 14, 2019, Mr. Mach circulated a draft of the formal Settlement Agreement to counsel for the Gavio Defendants, Deloitte, and LCV, as well as directly to Mr. Bonidy, which document was expected to reflect the preliminary settlement agreement reached between the parties and reflected in the Main Terms and Conditions.

64.     Upon review of this draft formal Settlement Agreement, it was clear that it

contained material and unacceptable deviations from the Main Terms and Conditions already agreed to between the parties.  LCV's counsel responded to counsel for all parties with a copy of the Main Terms and Conditions agreed to between the parties on January 24 with redline edits reflecting the additional terms agreed to during the negotiations that culminated in the February 5 settlement agreement, along with proposed edits to the draft formal settlement document that were consistent with the previously agreed to Main Terms and Conditions.

65.     Specifically, the Defendants sought new and sweeping release and indemnification language under which, *inter alia*, LCV and the Target Companies would indemnify and hold Defendants and their current and former directors, attorneys, agents, employees, and other related parties harmless not only against related future actions by LCV, but also against potential future actions by third parties Green Network and another entity called Deer Valley Homebuilders.

66.     At the time of these communications, LCV was not aware of why Defendants would suddenly demand these new indemnifications that were not included in the Main Terms and Conditions, but LCV was not willing to agree to such a major modification of the already agreed terms, particularly as it would mean assuming an unknown amount of new risk of litigation between third parties wholly outside LCV's control without any corresponding increase in the settlement payment that could possibly justify accepting such a liability.

67.     E-mails were exchanged between counsel for all parties regarding these unreasonable new demands by Defendants, which Defendants responded to by suggesting that these demands were consistent with the agreed Main Terms and Conditions, despite the indisputable fact that the third parties Green Network and Deer Valley Homebuilders appear nowhere in the Main Terms and Conditions document.  Many of these communications have

since been attached as exhibits to the Defendants' respective responses in opposition to the Motion to Enforce Settlement.

68.     During the course of these discussions, the parties agreed to the filing of a third motion for extension of time for all Defendants to respond to the Complaint.  This consent motion again represented to the Court that the "Parties have reached a settlement of the matter in principle and need additional time to finalize their agreement," and that the "approximately 7-day extension will promote judicial economy while the parties discuss resolution of the matter."

69.     By March 18, 2019 it had become apparent that the Defendants did not intend to abide by the preliminary settlement agreement reached between the parties, and that the Defendants did not intend to negotiate in good faith, and LCV filed a Motion to Enforce the agreement reflected by the Main Terms and Conditions.

70.     While that Motion was pending in this Court, LCV became aware of a number of factual issues that not only revealed that Defendants had been negotiating in bad faith, and engaging in misrepresentation and concealment, but further rendered the completion of the condition precedent impossible under the terms of the Main Terms and Conditions.

71.     First, LCV learned that CIE, identified in the Main Terms and Conditions as responsible for paying over the settlement proceeds to both EH and Energrid, had actually been placed in liquidation in June 2018, prior to entering into settlement negotiations with LCV in the present litigation.

72.     CIE and its counsel in the present litigation did not inform LCV that CIE was insolvent and had been placed in liquidation (nor that CIE's name, governance structure, and

charter have all been changed to reflect its status in liquidation). To the contrary, they drafted and advanced a settlement agreement under which CIE would serve as the payor of settlement funds on behalf of themselves **and** the other "Gavio Entities" which are defendants to this litigation.

73.     In fact, according to an exhibit attached to the Gavio Defendants' subsequently filed Brief in Support of their Motion to Dismiss the original complaint, CIE reportedly has total capital of only €50,000, far short of the amount the Defendants pledged that CIE would pay in settlement.

74.     Further, upon information and belief, CIE was the subject of criminal investigation by the Italian government regarding the nonpayment of taxes on behalf of its then-subsidiary, Target Company EET (formerly Energia et Territorio S.p.A., now Energia et Territorio S.r.l. in Liquidazione), in 2014-2015, the years leading up to the initial transaction giving rise to this litigation. LCV is informed that the governmental investigation culminated in Argo and/or its affiliates or other related persons or entities paying approximately €1.5 million in taxes and penalties on or about November 27, 2019 on behalf of CIE in order to avoid potential personal criminal liability for certain current and/or former directors and officers of those entities.

75.     In fact, the Gavio Defendants used this "tax dispute" as an opportunity to attempt to, once again, fraudulently induce LCV (via HII and EH), through misrepresentation and omission, into signing an agreement that was unduly beneficial to CIE and Argo and harmful to LCV.

76.     Upon information and belief, counsel for CIE and Argo approached Mr. Carlo Micchi, the independent liquidator employed for the purpose of managing EET in liquidation, in September 2019 to ask him to determine whether Mr. de Visconti and Mr. Bonidy would agree to

sign a "Tax dispute management agreement" under which, *inter alia*, CIE would file adjusted tax returns and pay the taxes and penalties claimed by the Italian government as a result of its criminal investigation.

77.     This agreement, drafted and propounded by counsel for Argo and CIE, and addressed to both Mr. Bonidy in Pittsburgh and Mr. de Visconti at his LCV e-mail address as representatives for HII, sought to have HII and EH along with their "parents, subsidiaries and affiliates, investors, successors and assigns… directors, attorneys and agents" release CIE and its "parents, subsidiaries and affiliates, investors, successors and assigns… former and current directors, statutory auditors, and agents" from any liability with respect the tax issues in 2014 and 2015.

78.     CIE and Argo applied pressure to induce HII and EH to execute the agreement quickly, under the stated or implied threat that otherwise CIE would refuse to pay the tax liabilities identified by the Italian authorities.

79.     For example, by e-mail dated Thursday, November 21, 2019, attorney Paolo Giacometti of Chiomenti, on behalf of Argo and CIE, contacted counsel for Plaintiff in Pittsburgh directly, and urged that the agreement should be returned executed before Monday, or else CIE would be prevented from curing the tax violations voluntarily, and the Italian tax authorities issue final notices of assessment with a material increase in the penalties due.  The implication of this was that the tax violations would continue to exist as an increased liability not only for CIE but for Plaintiff through its connection to EET in liquidation.  **Exhibit E**.

80.     Plaintiff responded to this assertion in good faith, working over the next several days to provide a redlined version on Sunday, November 24, 2019 of the proposed agreement that

Mr. de Visconti would be willing to sign.  This version included a request that—if Argo and CIE would not agree to consummate the settlement reflected by the Main Terms and Conditions contemporaneously with the tax agreement–Argo and CIE would at least reimburse Plaintiff's legal expenses incurred in working on the tax agreement, and would hold HII, EET, and their related parties harmless in the event of future liability arising out of the tax claims caused by CIE and Argo's fraudulent tax filings on behalf of EET in 2014-2015.

81.     By e-mail dated Tuesday, November 26, 2019, Mr. Giacometti again wrote to LCV's Pittsburgh counsel on behalf of CIE and Argo, rejecting key redlines proposed by Plaintiff and insisting again on broad release language favoring CIE, Argo, and their related parties, and demanding acceptance of that version the same day, or else "CIE will not be able to enter into an agreement."

82.     Mr. Bonidy and Mr. de Visconti did not agree to CIE and Argo's latest version, but were informed on or about November 27, 2019 that Argo had in fact made the voluntary tax payments to the Italian authorities on CIE's behalf without any signed agreement from HII or EET.  Upon information and belief, Argo and CIE were fully able at all times to make the voluntary delinquent tax payments without the need for any sort of agreement from Mr. Bonidy and Mr. de Visconti, and falsely represented the purported need for an agreement as a mechanism to induce Plaintiff to release its valid legal claims against Argo, CIE, and related entities.

83.     Finally, LCV was informed on or about December 17, 2019 that Energrid S.r.l. in Liquidazione has now received a demand from an agency of the Italian state to pay approximately €4.5 million plus additional sanctions that, per statute, could range from €2.5 million up to €150 million based upon then-Energrid S.p.A.'s (now Energrid S.r.l. in Liquidazione's) improper

accounting for certain so-called "unbalancing transactions" which resulted in improper financial reporting for the years 2015-2017.

84.     Although, upon information and belief, Defendants were aware of this looming liability, they failed to set aside proper reserves on Energrid's balance sheet to reflect the known liability, and they further failed to disclose this liability to LCV at any point, from the time of the due diligence disclosures and negotiations in 2016 through the settlement negotiations in 2019.

85.     The investigations and penalties imposed by the Italian tax authorities provide further evidence of the Defendants' then-present intention to misrepresent the true financial status of Energrid S.p.A. (now Energrid S.r.l in Liquidazione) and Energia et Territorio S.p.A. (now Energia et Territorio S.r.l. in Liquidazione) at the time of the underlying transaction set forth in the Complaint.

86.     Moreover, these major liabilities, of which Defendants were aware but did not disclose to LCV at any time before or during the settlement negotiations in this matter, appear to explain at least in part why Defendants sought to insert insupportably sweeping release and indemnification language into the final settlement agreement.

87.     Upon information and belief, it now appears that Defendants expected the "unbalancing" liability and sanctions would be issued to Green Network as the new owner of Energrid's business concerns, and that Green Network would subsequently initiate action against Defendants to hold them responsible for the wrongdoing that occurred under their management of Energrid.  Thus, Defendants insisted upon adding language to the settlement agreement under which Plaintiff would indemnify Defendants against this litigation Defendants anticipated from Green Network.

88.     Additionally, given Defendants' actions and pattern of behavior to date, it is fully possible that there are yet more hidden liabilities known to Defendants and still unknown to Plaintiff that serve as further basis for Defendants' insistence upon such untenably sweeping release and indemnification language.

89.     However, because the "unbalancing" penalty notices were not issued to Green Network, but to Energrid in Liquidation, which Plaintiff is still responsible for managing because Defendants did not comply with the settlement agreement to complete the Article 67 process and payment so that Energrid can be dissolved, Plaintiff is currently being forced on an ongoing basis to expend yet more resources to bring action in Italy on behalf of Energrid to hold Defendants properly responsible for the "unbalancing" penalties they incurred.

90.     Finally, as a result of the "unbalancing" penalties now having come to light, which could range from €4.5 million to over €150 million, it is now not possible to complete the Article 67 process—a critical condition precedent of the Main Terms and Conditions—because the amount of the agreed settlement payment into Energrid is not sufficient to cover both Energrid's previously known liabilities and the recently disclosed "unbalancing" liabilities.

91.     Given both CIE's legally and financially compromised status in liquidation, as well as the significant exposure to outstanding Italian tax obligations and other penalties that the Gavio Defendants have now acknowledged at least in part, it appears to LCV that the Defendants had neither the intent nor the ability to fulfill their settlement promises to LCV, but rather engaged in bad faith negotiations for the purposes of delay, obstruction, and, ultimately, defrauding LCV into releasing Defendants from and/or indemnifying Defendants for major liabilities, the existence of which Defendants concealed from and did not disclose to Plaintiff.

92.     Because of the Defendants' failure to acknowledge and honor the terms of the preliminary settlement agreement between the parties, i.e., the Main Terms and Conditions agreed to between the parties on January 24 with redline edits reflecting the additional terms agreed to during the negotiations from January 24 through February 5, 2019, LCV has suffered damages, including the lack of the agreed-upon settlement payment, ongoing litigation costs incurred in seeking to enforce the settlement of this action, and lost business opportunities.

## COUNT I—RICO 1962(c)

93.     Paragraphs 1 through 92 are incorporated by reference as if set forth fully herein.

94.     This count is against Defendants Argo and CIE (the "Count I Defendants").

95.     CIE and the association-in-fact enterprise of Argo, CIE, Mr. Viviano, Mr. Rubegni, the Target Companies and their Statutory Auditors (prior to their acquisition by EH) are each an "enterprise" as that term is used in 18 U.S.C. § 1961(4).

96.     During at least 2014 through 2016, the association-in-fact enterprise of Argo, CIE, Mr. Viviano, Mr. Rubegni, the Target Companies and their Statutory Auditors had the purposes of operating CIE and the Target Companies in a manner which consistently overcharged utilities customers, fraudulently evaded tax obligations, and falsified the Target Companies' financial statements in order extract unsupported and improper profits from the Target Companies before eventually unloading them at a price far above their real value onto an outside investor by means of fraudulently misrepresenting the Target Companies' financial position.

97.     The association-in-fact enterprise of Argo, CIE, Mr. Viviano, Mr. Rubegni, the Target Companies and their Statutory Auditors was related not only by the corporate relationship through which Argo owned a majority of CIE, which in turn owned the Target Companies, but also by the fact that Mr. Viviano and Mr. Rubegni held officer and/or director positions across Argo, CIE, and the Target Companies, and acted as agents for the Count I Defendants.  The

Target Companies' Statutory Auditors were employed by the Target Companies, but instead of serving as independent watchdogs as intended under Italian law, upon information and belief, they were fully aware of and condoned the fraudulent financial statements and information issued by the Target Companies and disseminated by the other members of the association-in-fact.

98.     Since EH's acquisition of the Target Companies in 2016 until the present, CIE as an enterprise and the association-in-fact enterprise of Argo, CIE, Mr. Viviano, and Mr. Rubegni have continued to operate, with the purposes of guarding and retaining their ill-gained profits obtained in the time up to and including Plaintiff's acquisition of the Target Companies, and continuing to improperly foist their own liabilities onto Plaintiff and others (including, for example, the Target Companies' unpaid creditors, Green Network, and the Italian taxing and regulatory authorities) through a pattern of stonewalling, bad faith negotiations, fraud, misrepresentation and omission.

99.     The association-in-fact enterprise of Argo, CIE, Mr. Viviano, Mr. Rubegni were related not only by the corporate relationship through which Argo owned a majority of CIE, but also by the fact that Mr. Viviano and Mr. Rubegni held officer and/or director positions with Argo and CIE and acted as agents for the Count I Defendants up to the present time.

100.     The foregoing enterprises have been engaged in activities which affect interstate commerce in that they solicited international investment in their Italian companies, which solicitation was ultimately directed at Plaintiff, a Delaware corporation with its primary place of business in Pennsylvania.  The foregoing enterprises further engaged in operations, and govern assets and employees which affect interstate commerce including the sale and provision of utilities, and the ownership and operation of toll roads internationally.  The Count I Defendants are employed by or are associated with the identified enterprises.

101.     Argo, CIE, Mr. Viviano, Mr. Rubegni, the Target Companies (Energrid, EET,

and SIG), and the individual Statutory Auditors of the Target Companies are each "persons" as that term is used in 18 U.S.C. § 1961(3).

102.    The Count I Defendants agreed to and did conduct and participate in the conduct of the enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.

103.    Specifically, pursuant to and in furtherance of their fraudulent scheme, the Count I Defendants committed multiple related acts of mail fraud under 18 U.S.C.A. § 1341 and wire fraud under 18 U.S.C.A. § 1343.  Their use of mail and wire communications formed a central feature of their fraudulent scheme and included, by way of example and as described above, conveying fraudulent financial information to Plaintiff to induce Plaintiff to invest in the Target Companies, engaging in fraudulent and bad faith negotiations in order to delay or wholly avoid responsibility for their own liabilities, and engaging in fraudulent and bad faith negotiations to prevent Plaintiff from being able to complete an orderly dissolution of the Target Companies in liquidation.

104.    By way of example, the communications described in detail in paragraphs 19 and 21 herein, and attached hereto as Exhibits A and B, each represent an instance of mail and/or wire fraud on the dates of: July 30, 2016; August 1, 2016; August 2, 2016; August 25, 2016; August 29, 2016; September 24, 2016; September 25, 2016; September 28, 2016; September 30, 2016; October 24, 2016; and each of the dates listed in Schedule H to the SPA.

105.    By way of further example, the communications described in detail in paragraphs 30, 32, 40-55, 62, and 79 herein, and attached hereto as Exhibits C-E, each represent an instance of mail and/or wire fraud on the dates: July 25, 2017, August 2, 2017; January 7, 2019; January 11, 2019; February 5, 2019, and November 21, 2019.

106.     These acts constitute multiple violations of predicate offenses for the purposes of 18 U.S.C. § 1962(c), and constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

107.     The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

108.     As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property in multiple and ongoing ways, including the following by way of example:

a.   The loss of approximately €15,000,000.00 directly resulting from Plaintiff's investment of its domestic assets in the Target Companies in reliance upon the fraudulent representations of the Count I Defendants and their associates and agents;

b.   The loss of approximately $3.3 million in additional domestic assets as Plaintiff infused its own capital into the Target Companies following the acquisition in order to keep the Target Companies afloat while Plaintiff was in the process of discovering the fraud and other wrongdoing perpetrated by the Count I Defendants and their associates and agents;

c.   The ongoing costs and expenses of managing the Target Companies in liquidation due to the Count I Defendants' and their associates' and agents' refusal to accept responsibility for their wrongdoing, including their refusal to carry out the steps necessary for the Target Companies to complete the Article 67 procedures;

d.  The costs, in the form of legal fees and related expenses, of engaging in good faith negotiations with the Count I Defendants while the Count I Defendants misrepresented their present intentions, and wrongfully concealed and misrepresented facts material to the negotiations;

e.  The loss of the value of the funds that were promised to be paid by the Count I Defendants as part of the Material Terms and Conditions, both directly, and in the form of unfavorable exchange rate changes between the time the payment was promised to be made and the present time;

f.  The costs of lost investment opportunity in Plaintiff's other ventures due to Plaintiff's domestic funds being expended and diminished as described above.

109.    Pursuant to 18 U.S.C. 1964(c), Plaintiff is entitled to its actual damages, treble damages, and attorney's fees and costs.

## COUNT II—RICO 1962(d)

110.    Paragraphs 1 through 109 are incorporated by reference as if set forth fully herein.

111.    This count is against all Defendants.

112.    As set forth above, Argo, CIE, and Deloitte together with Mr. Calvetti, Mr. Viviano, Mr. Rubegni, the Target Companies, and the Statutory Auditors of the Target Companies from 2014-2016 agreed and conspired to violate 18 U.S.C. § 1962(c).

113.    Each Defendant intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprises described above through a pattern of racketeering activity.  Argo, CIE, and Deloitte each knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those

acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

114.     Specifically, pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of mail fraud under 18 U.S.C.A. § 1341 and wire fraud under 18 U.S.C.A. § 1343, as well as multiple non-predicate overt acts committed in order to further the conspiracy.  By way of example and as described above, the Defendants knowingly and intentionally conveyed fraudulent financial information to Plaintiff with the intent and effect of inducing Plaintiff to invest in the Target Companies. Additionally, Defendants worked together with their co-conspirators Mr. Calvetti and Mr. Viviano to convey the fraudulent information to Plaintiff, with Mr. Calvetti acting as a "double agent", purporting to serve and nominally serving as an agent to Plaintiff while surreptitiously conspiring with Defendants in furtherance of the fraudulent scheme.

115.     By way of example, the communications described in detail in paragraphs 19 and 21 herein, and attached hereto as Exhibits A and B, each represent an instance of mail and/or wire fraud on the dates of: July 30, 2016; August 1, 2016; August 2, 2016; August 25, 2016; August 29, 2016; September 24, 2016; September 25, 2016; September 28, 2016; September 30, 2016; October 24, 2016; and each of the dates listed in Schedule H to the SPA.

116.     Additionally, Deloitte overtly acted in furtherance of the conspiracy by compiling and certifying audited financial statements which it knew to be false and fraudulent, and which it knew investors such as Plaintiff would rely upon to their detriment in making significant financial investments.  As described herein and as evidenced in the exhibits, by way of example, Deloitte was an active and direct participant in conveying fraudulent information to Plaintiff upon which Plaintiff relied in deciding to invest in the

Target Companies.

117.   Additionally, as set forth above, Argo, CIE, and Deloitte then continued to conspire together with Mr. Viviano and Mr. Rubegni through the present time by engaging in fraudulent and bad faith negotiations in order to delay or wholly avoid responsibility for their own liabilities, and engaging in fraudulent and bad faith negotiations to prevent Plaintiff from being able to complete an orderly dissolution of the Target Companies in liquidation.

118.   Thus, all Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the identified enterprises through a pattern of racketeering activity.  All Defendants knew that their predicate acts and other overt acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. § 1962(d).

119.   As direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property, including but not limited to the following:

   a.   The loss of approximately €15,000,000.00 directly resulting from Plaintiff's investment of its domestic assets in the Target Companies in reliance upon the fraudulent representations of the Defendants and their co-conspirators, associates, and agents;

   b.   The loss of approximately $3.3 million in additional domestic assets as Plaintiff infused its own capital into the Target Companies following the acquisition in order to keep the Target Companies afloat while Plaintiff was in the process of discovering the fraud and other wrongdoing perpetrated by the Defendants and their co-conspirators, associates, and agents, including

particularly each of the Defendants' acrimonious refusal to provide accurate financial information so that reliable and correct audited financial statements for the Target Companies could be approved;

c.   The ongoing costs and expenses of managing the Target Companies in liquidation due to the Defendants' and their co-conspirators, associates', and agents' refusal to accept responsibility for their wrongdoing, including their refusal to carry out the steps necessary for the Target Companies to complete the Article 67 procedures;

d.   The costs, in the form of legal fees and related expenses, of engaging in good faith negotiations with the Defendants while the Defendants misrepresented their present intentions, and wrongfully concealed and misrepresented facts material to the negotiations;

e.   The loss of the value of the funds that were promised to be paid by the Defendants as part of the Material Terms and Conditions, both directly, and in the form of unfavorable exchange rate changes between the time the payment was promised to be made and the present time;

f.   The costs of lost investment opportunity in Plaintiff's other ventures due to Plaintiff's domestic funds being expended and diminished as described above.

120.    Pursuant to 18 U.S.C. 1964(c), Plaintiff is entitled to its actual damages, treble damages, and attorney's fees and costs.

## COUNT III—FRAUD

121.    Paragraphs 1 through 120 are incorporated by reference as if set forth fully herein.

122.     Under Pennsylvania law, to state a claim for fraud, Plaintiff must allege: 1) a representation by or on Defendant's behalf, 2) which is material to the transaction at hand, 3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; 4) with the intent of misleading another into relying on it; 5) Plaintiff's justifiable reliance upon the representation; and 6) that the resulting injury was proximately caused by the fraudulent representation.

123.     Here, as detailed above, each of the Defendants individually and jointly affirmatively misrepresented to Plaintiff the true value of the Target Companies in order to induce Plaintiff to purchase the Target Companies.

124.     Those affirmative representations were material inasmuch as they served to induce Plaintiff to invest approximately €18 million into the transaction.

125.     Defendants made the affirmative misrepresentations to Plaintiff with full knowledge of their falsity of at the time of making them.

126.     Defendants made the affirmative misrepresentations with the intent of misleading LCV into relying on them.

127.     LCV justifiably relied upon the affirmative misrepresentations inasmuch as they were made in the guise of audited financial statements, requested in the course of due diligence with the clear and express purpose of determining the true value of EG in the context of the purchase transaction.

128.     As further alleged in detail above, the Defendants also intentionally and affirmatively entered into fraudulent and bad faith negotiations with Plaintiff, with the purpose of delaying and/or wholly avoiding liability for their wrongful acts against both Plaintiff and others.

129.     LCV has suffered severe economic harm as a direct result of its justifiable reliance upon Defendants' affirmative misrepresentations, including but not limited to the loss of monies

invested in the Target Companies, lost business revenue, lost business opportunity, loss of promised settlement payments, devaluation of promised payments as a result of delay and exchange rate fluctuation, and legal fees and expenses.

## COUNT IV—CIVIL CONSPIRACY

130.    Paragraphs 1 through 129 are incorporated by reference as if set forth fully herein.

131.    To state a valid claim for civil conspiracy in Pennsylvania, a party must show two or more persons combined or agreed with intent to do an unlawful act or do any otherwise lawful act by unlawful means.

132.    In the present case, as outlined in detail above, intending malice to the Plaintiff, each and every one of the Defendants overtly agreed to unlawfully and affirmatively misrepresent to the Plaintiff the true financial condition of the Target Companies, which act resulted in actual and direct legal damage to the Plaintiff.

133.    As further alleged above, the Defendants also conspired to enter into fraudulent and bad faith negotiations with Plaintiff, with the purpose of delaying and/or wholly avoiding liability for their wrongful acts against both Plaintiff and others.

134.    LCV has suffered severe economic harm as a direct result of the Defendants' conspiracy, including but not limited to the loss of monies invested in the Target Companies, lost business revenue, lost business opportunity, loss of promised settlement payments, devaluation of promised payments as a result of delay and exchange rate fluctuation, and legal fees and expenses.

## COUNT V—BREACH OF CONTRACT

135.    Paragraphs 1 through 134 are incorporated by reference as if set forth fully herein.

136.    There is no express reservation of the right not to be bound in the Main Terms and Conditions.   The language of the Main Terms and Conditions and subsequent written communications clearly evidence the parties' intent to be bound by that agreement.

137.    The Plaintiff has partially performed its obligations under the Main Terms and Conditions by, without limitation, the hiring of attorneys and others to execute the final Settlement Agreement, and the staying of this action.

138.    All of the important settlement terms had been agreed upon in the Main Terms and Conditions agreed to between the parties on January 24 with redline edits reflecting the additional terms agreed to during the negotiations from January 24 through February 5, 2019.  As of February 5, 2019, there were no significant open terms.

139.    The Main Terms and Conditions constitute an agreement that inherently creates a duty of good faith and fair dealing.

140.    The Defendants have breached their duty of good faith and fair dealing by, without limitation, the imposition of conditions not found in the Main Terms and Conditions, the misrepresentation, concealment, and failure to disclose significant material facts known only to Defendants and which Defendants had a duty to disclose to Plaintiff, and the failure to carry out the terms of the agreement in good faith.

141.    Because of Defendants' multiple actions in bad faith, it has now become apparent that the critical condition precedent of the Article 67 Procedure has become impossible to complete under the terms of the Main Terms and Conditions, because the sum certain that Defendants pledged to pay into Energrid will no longer be sufficient to cover the recently revealed liabilities and allow an orderly dissolution of Energrid.  According to the language of the Main

Terms and Conditions, the failure of this condition precedent renders the agreement null and void.

142.     However, under the common law, one who unjustly prevents the performance of a condition precedent that is his own duty to perform is not permitted to take advantage of his wrongdoing and thereby escape liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.

143.     Because of the failure of the condition precedent due to the bad faith acts of the Defendants, Plaintiff cannot be compelled to perform its obligations under the Main Terms and Conditions.  By way of example, the release of claims against Defendants cannot be enforced where Defendants knowingly, intentionally, wrongfully, and in bad faith concealed material liabilities from Plaintiff, and those liabilities remain outstanding because the amount promised by the Defendants in settlement are insufficient to clear them.

144.     However, Plaintiff has performed all of its obligations under the Main Terms and Conditions insofar as possible given Defendants' actions.

145.     The Defendants' breach has caused serious damages to Plaintiff, including without limitation, loss of the promised settlement payment, devaluation of promised payments as a result of delay and exchange rate fluctuation, consequential damages in the form of lost business revenue and opportunity, and ongoing legal fees and expenses.

146.     The Plaintiffs are entitled to direct and consequential damages arising out of Defendants' breach of contract and breach of their duty of good faith and fair dealing.

### COUNT VI—BREACH OF DUTY TO NEGOTIATE IN GOOD FAITH

147.     Paragraphs 1 through 146 are incorporated by reference as if set forth fully herein.

148.     There is no express reservation of the right not to be bound in the Main Terms and Conditions.   The language of the Main Terms and Conditions and subsequent written communications clearly evidences the parties' intent to be bound by that agreement.

149.     The context of the negotiations, i.e., lengthy telephone and e-mail negotiations culminating in travel to New York City for a negotiation meeting solicited by Argo and CIE, at the very least support the existence of a binding preliminary agreement.

150.     Plaintiff has partially performed its obligations under the Main Terms and Conditions by, without limitation, the hiring of attorneys and others to execute the final Settlement Agreement, and the staying of this action.

151.     All of the important terms of the parties' settlement agreement had been agreed upon in the Main Terms and Conditions agreed to between the parties on January 24 with redline edits reflecting the additional terms agreed to during the negotiations from January 24 through February 5, 2019.  There were no significant open terms.

152.     The Main Terms and Conditions constitute at least a binding preliminary agreement that requires the parties to negotiate in good faith.

153.     The Plaintiff has performed all of its obligations under the Main Terms and Conditions.

154.     The Defendants have breached their duty to negotiate in good faith as pleaded herein including, without limitation, the imposition of conditions not found in the Main Terms and Conditions, the misrepresentation, concealment, and failure to disclose significant material facts

known only to Defendants and which Defendants had a duty to disclose to Plaintiff, and the failure to carry out the terms of the agreement in good faith.

155.    The Defendants' breach has caused serious damages to Plaintiff, including without limitation, loss of the promised settlement payment, devaluation of promised payments as a result of delay and exchange rate fluctuation, consequential damages in the form of lost business revenue and opportunity, and ongoing legal fees and expenses.

156.    The Plaintiffs are entitled to direct and consequential damages arising out of Defendants' breach of their duty to negotiate in good faith.

### COUNT VII—MISREPRESENTATION

157.    Paragraphs 1 through 156 are incorporated by reference as if set forth fully herein.

158.    Defendants made multiple misrepresentations directly to LCV as described more fully herein, including, without limitation, misrepresentations regarding the financials of the Target Companies, and misrepresentations regarding the Defendants' present intentions to negotiate and enter a settlement of the parties' disputes in good faith.

159.    Defendants' representations, described more fully above, were material to the transactions between the parties, and induced Plaintiff LCV to take detrimental actions in reliance upon the misrepresentations.

160.    Defendants' representations were made under circumstances in which the Defendants knew or should have known of their falsity.

161.    Defendants' representations were made with intent to cause Plaintiff to take actions in reliance as described herein, including, without limitation, investing in the Target Companies, placing litigation on hold and incurring expenses based on representations regarding good faith settlement.

162.     Plaintiff's reliance on Defendants' misrepresentations should have been and was foreseeable to Defendants.

163.     As a result of Plaintiff relying on the oral and written representations made by Defendants, Plaintiff has suffered damages including but not limited to the loss of monies invested in the Target Companies, lost business revenue, lost business opportunity, loss of promised settlement payments, devaluation of promised payments as a result of delay and exchange rate fluctuation, and legal fees and expenses.

## COUNT VIII—UNJUST ENRICHMENT

164.     Paragraphs 1 through 163 are incorporated by reference as if set forth fully herein.

165.     Under the common law doctrine of unjust enrichment, Defendants, by their pattern of activity described herein, benefited from, and increased their profits by effecting a scheme which induced Plaintiff to invest far in excess of fair market value into the Target Companies at the time they were owned and controlled by CIE and Argo, and by subsequently seeking to and in many instances succeeding in avoiding and/or delaying their own liabilities by shifting responsibility for concealed liabilities to LCV.

166.      Defendants accepted and received the benefits of unwarranted profits and delayed liabilities by inflicting the true cost of these items on Plaintiff.  It is inequitable and unjust for Defendants to retain these monies, which were procured by fraudulent pretenses and representations.

167.     Plaintiff is entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants, plus interest on these amounts.

WHEREFORE, Plaintiff respectfully requests that the Court award it the following relief:

a)   Compensatory and consequential damages in the form of direct economic harm in an amount in excess of $75,000.00;

b)   Treble damages and attorney fees with respect to the damages suffered as a result of the RICO claims;

c)   Prejudgment interest;

d)   Punitive damages;

e)   Any and all other relief to which Plaintiff is entitled.

PLAINTIFF DEMANDS TRIAL BY JURY.


Respectfully submitted,


/s/ Alicia M. Schmitt
Bruce E. Stanley (PA ID: 56840)
Alicia Schmitt (PA ID: 200970)
Stanley & Schmitt PC
2424 Craftmont Avenue
Pittsburgh, PA 15205
T: (412) 401-4654
bruce@stanleyschmittlaw.com
alicia@stanleyschmittlaw.com

*Attorneys for Plaintiff*


Dated:  January 30, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2020 true and correct copies of the foregoing Amended

Complaint and its exhibits were filed electronically via the Court's ECF system.  Notice of this

filing will be sent to all parties who have appeared in this action via the Court's ECF system.

Parties may access this filing through the Court's ECF system.


/s/ Alicia M. Schmitt